Date signed July 03, 2008



NANCY V. ALQUIST
U. S. BANKRUPTCY JUDGE

### UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF MARYLAND
### (Baltimore Division)

| | | |
|---|---|---|
| In re: | * | |
| **WILLIAM L SISKIND** | * | **Case No. 02-65786-NVA** |
| | | **(Chapter 11)** |
| **Debtor** | * | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

### MEMORANDUM OPINION IN SUPPORT OF ORDER GRANTING
### MOTION [767] OF THE LIQUIDATING TRUSTEE FOR APPROVAL
### OF SALE OF ASSETS AND SETTLEMENT AGREEMENT BETWEEN THE
### LIQUIDATING TRUSTEE, STEPHEN VINCENT, TRANSAMERICAN DOMINICANA
### AND METROINVEST CONSULTANTS CORP, AND DENYING MOTION [846]
### IN LIMINE OF JEFFREY SISKIND AND WENDY BUCKINGHAM SISKIND

On December 19, 2007, Richard Gray, the Liquidating Trustee ("Mr. Gray" or the "Trustee")

under the Debtor's Confirmed Third Amended Plan of Reorganization, filed a Motion [767] for

Approval of Sale of Assets and Settlement Agreement (the "Sale Motion"). The Sale Motion seeks,

among other things, to sell to Stephen Vincent ("Mr. Vincent") the estate's interest in the majority

of the remaining assets of the estate, including all of the estate's right, title and interest in the

following assets: (i) the 25,000 share joint certificate in Casino del Caribe (a casino in the

Dominican Republic) held by the Debtor and his wife, (ii) one half ( or 5,625 shares) of the 11,250

joint share certificate owned jointly between the Debtor and his son Jeffrey Siskind ("Jeffrey"), (iii) one half (or 5,625 shares) of the 11,250 joint share certificate owned jointly between the Debtor and his daughter, Wendy Buckingham Siskind ("Wendy"), (iv) the Debtor's 50% interest in the La Mesa race track (a non-operational racetrack in Raton, New Mexico), (v) the Debtor's 53% interest in Mangin, Inc. (a company wholly owned by the Debtor that owns a minority shareholder interest in the Casino del Caribe), and (vi) the Debtor's right to use an apartment at the Juaragua Hotel in the Dominican Republic.

The Sale Motion filed in late 2007 was heard in early 2008. The Court heard three days of evidentiary hearings on the Sale Motion in April, 2008. The Chapter 11 Plan in this case was confirmed over two years earlier. As will be discussed at length, *infra*, the parties objecting to the sale make much of the fact that the Trustee has sought relief by motion, rather than by complaint. In an argument ultimately rejected by the Court, the objectors (the Debtor and his children) insist that the motion procedure is procedurally defective and that the Trustee's request was required to have been made by adversary proceeding. Although this argument is explored again at more length later in this Memorandum Opinion, it bears noting early on that the filing by the Trustee of a <u>motion</u> (rather than a complaint) should have come as no surprise to anybody. The Order [538] confirming the Debtor's Chapter 11 Plan that was entered by the Honorable E. Stephen Derby on November 4, 2005 contemplates specifically that the Debtor or Trustee would seek court authority to sell, and that this would be done by motion. See Order [539] at § 6.5.(b).

In addition to the sale of assets, the Sale Motion also seeks to settle certain outstanding claims and controversies. Approval of the Sale Motion would result in a dismissal of all adversary proceedings brought by the Trustee against Mr. Vincent and his entities, and also result in the

2

dismissal of the pending bankruptcy case of La Mesa.[1]  The Sale Motion further seeks to approve an underlying agreement that terminates the service of Mr. Gray as Trustee and appoints a new Trustee, (the Substitute Trustee), an individual to be appointed upon the recommendation of the United States Trustee's office.  The motion anticipates that Mr. Gray will stay involved in the case as a non-compensated disbursing agent.  However, in the event that Mr. Gray should find it necessary to institute collection proceedings in the future related to the assets subject to the Sale Motion, Mr. Gray would be empowered to employ professionals to assist him with this task.

Underlying the Sale Motion is a written document between Mr. Gray and Mr. Vincent (the "Agreement").  Under the Agreement, Mr. Vincent is to purchase the assets being sold under the Sale Motion for a purchase price of $2.6 million payable over three years, with a deposit of $270,000 paid upon execution of the final sale agreement and an additional payment by Mr. Vincent to the Trustee of $930,000 within five business days after Court approval of the Agreement. The remaining payments are to be made on a schedule of periodic payments with the final payment of $500,000 to be made within 30 months. Mr. Vincent is also to pay $100,000 in interest to the Trustee, pro-rated, over the three-year payment term of the Agreement.  Payment by Mr. Vincent for these assets is to be secured by a recourse note, and by Mr. Vincent's pledge to the seller of Mr. Vincent's own partial interest in the assets covered by the sale.  During the pendency of the repayment period, the casino, La Mesa and Mangin have agreed not to transfer, assign or otherwise encumber any of the assets being pledged.

Three objections and two preliminary motions *in limine* were filed with respect to the Sale

---

[1]  La Mesa, the racetrack in Raton, New Mexico, is itself a debtor in *In re La Mesa Racing, LLC*, Case No.07-17069 (Chapter 11).

3

Motion.  As stated, approximately three days of evidentiary trial on the Sale Motion and attendant matters were held.

La Mesa's Objection

The objection of La Mesa [771] was withdrawn [850] prior to the start of trial.

Jeffrey's and Wendy's Objection to the Sale Motion and their Motions in Limine

On January 8, 2008, Jeffrey and Wendy, the Debtor's adult children, filed an Objection [775]to the Sale Motion. In their objection, Jeffrey and Wendy claim to hold 10% each of the casino's shares in their own name and object to the proposed sale to the extent that it purports to affect their rights or sell their interests in the casino.  Their January 2008 objection does not assert any argument that they are entitled to an adversary proceeding in order to determine the scope of their ownership or the propriety of the sale of interests that the Trustee proposed to conduct.  The absence of this procedural objection in their January 2008 papers is notable because so much of their objection at trial was devoted to this point.

An evidentiary hearing on the Sale Motion and the objections thereto was duly noticed to Jeffrey's and Wendy's counsel on January 8, 2008.  The January 8, 2008 Notice stated that a hearing on the Sale Motion would commence March 17, 2008 and the hearing was thereafter set for April 2, 2008.  Jeffrey and Wendy, through counsel, were among the parties to whom the Hearing Notice was sent.  Still, Jeffrey and Wendy filed no additional papers in response to the Sale Motion until the eve of the April 2 hearing.

On the evening of April 1, 2008, the night before trial was to begin, Jeffrey and Wendy filed their Motion in Limine [846] to Exclude All Evidence Related to Determining Their Ownership Interests in Casino Del Caribe.  This Motion in Limine (the "Ownership Motion in Limine")

4

contends that the Trustee is seeking to sell half of each of Jeffrey and Wendy's joint interest in the casino - some 11,250 shares that each allegedly owns jointly with William Siskind, the Debtor.[2]

The Ownership Motion in Limine seeks to exclude all evidence relating to a determination of Jeffrey and Wendy's Ownership Interest in the Casino. The Ownership Motion in Limine asks the Court to invoke Bankruptcy Rule 7001(2) which requires that "a proceeding to determine the validity priority or extent of a lien or other interest in property" must be initiated by adversary proceeding. For example at paragraph 12 of the Ownership Motion in Limine, Jeffrey and Wendy state:

> [T]he issues which the Liquidating Trustee and Vincent seek to have determined are clearly within the plain meaning of Bankruptcy Rule 7001(2). There is an effort to have this Court determine that the Siskind Children's interests in the Casino are in shares held jointly with the Debtor and that the Siskind Children do not own any shares in the Casino individually. That is a request to determine the validity and extent of the Siskind Children's property interests in the Casino. Rule 7001(2) applies to that request and the Siskind Children are entitled to the due process protections provided by Part VII of the Bankruptcy Rules.

*Ownership Motion in Limine* at ¶ 12.

The Ownership Motion in Limine further argues that an adversary proceeding would require the Trustee to state with finality the relief he is seeking, *Ownership Motion in Limine* at ¶ 14 and an adversary proceeding would "require the Court to enter a scheduling order for all pre-trial

---

[2] Jeffrey and Wendy filed an additional Motion in Limine [845] on the eve of trial to exclude the testimony of Monika Infante, Esquire, Stephen Vincent's expert on Dominican law. Paper [845] was mooted during the early stages of trial, as stated on the record by Jeffrey's and Wendy's counsel when the Trustee determined that he would not call Ms. Infante in his case in chief. Thereafter, the Trustee declined to call Ms. Infante as a rebuttal witness as well.

procedures and the parties would be bound by the rules of discovery." *Ownership Motion in Limine* at ¶ 17. At the outset of the hearing it was determined and agreed that the case would commence and that the Court would be asked at the appropriate time to address the Ownership Motion in Limine.

Though the Sale Motion has proceeded as a contested matter, and not as an adversary proceeding as Jeffrey and Wendy would have liked, the Sale Motion was in no way handled in summary fashion.[3] The Court heard three days of evidence, opening and closing arguments, and held a status conference during the trial to address the issues raised by the Ownership Motion in Limine. The Trustee, the Debtor, Stephen Vincent, Jeffrey and Wendy <u>all</u> have actively participated in the presentation of evidence and cross-examination.

In similar circumstances, many courts that have considered the issue have determined that a litigant, even if technically entitled to the procedural protections of an adversary proceeding, may have its rights determined in a contested matter if its rights are determined in non-summary fashion. *See, e.g. In re Cannonsburg Environmental Associates, Ltd.*, 72 F.3d 1260, 1265 (6th Cir. 1996) ("[A]lthough the Trustee should have filed an adversary complaint instead of a motion, this error was harmless."); *In re Zolner*, 249 B.R. 287, 292 (N.D. Ill. 2000) ("[U]nless the party is able to demonstrate prejudice by the failure to file an adversary complaint instead of a motion, a court will find the error...constitutes harmless error."); *In re Orfa Corp.*, 170 B.R. 257 (E.D. Pa. 1994) (commenting that when rights of affected parties have been adequately protected and there is no prejudice, a court should not elevate form over substance); *In re Service Merchandise Company,*

---

[3] Again, the Court emphasizes that the Debtor's confirmed Chapter 11 Plan of reorganization, at 6.5 (b), permits the Trustee to seek authorization for a sale of assets pursuant to § 363 (h) by motion. *See* Judge Derby's Confirmation Order [Docket 539].

6

*Inc.*, 256 B.R. 755 (M.D. Tenn. 2000) (opining that debtor's § 363 motion, even though it sought an injunction against landlords, was not error based on judicial economy and lack of credible evidence of prejudice shown by the landlords).  *See also*, *In re Corporacion de Servicios Medico Hospitalarios de Fajardo,* 123 B.R. 4, *7 (D.P.R. 1991) (finding that litigant waived its right to argue that it was entitled to an adversary proceeding rather than a contested matter where litigant raised adversary proceeding entitlement for the first time "virtually on the eve of trial.").

This Judge, too, has opined that "even if an adversary proceeding would have been the proper place to start, it is not necessarily improper to permit the action to go forward having begun as a contested matter, particularly in circumstances like this one where all parties received adequate notice and participated fully in an evidentiary hearing on all issues." *In re Dides*, 2006 WL 4667126 (Bankr. D. Md. 2006).  *Cf., In re Haber Oil Co., Inc.*, 12 F.3d 426 (5th Cir. 1994) (even though hearing itself was comprehensive and evidentiary, respondent was not given sufficient notice prior to hearing in order to prepare adequately; this notice would have been available in the context of an adversary proceeding).

In order to explore fully this issue with all affected parties, this Court convened a status conference on April 14, 2008.  All represented parties attended.  At that status conference, the Court discussed its procedural concerns and offered Jeffrey and Wendy the opportunity to either engraft certain of the adversary proceeding provisions of Part VII of the Bankruptcy Rules onto this existing contested matter or actually to convert this matter into an adversary proceeding.  Either alternative would have given Jeffrey and Wendy the opportunity to conduct discovery and would have given them sufficient time to conduct additional discovery. These suggestions were vigorously opposed by the Trustee.

Jeffrey and Wendy rejected the options suggested by the Court. They were adamant that they did not wish to delay the case before the Trustee's expert was presented[4] to permit them to conduct discovery and that they wanted to go forward in this contested matter but "without prejudicing their objection to their right to have it heard as an adversary proceeding." Further, they reiterated that they wished to have the Court determine the Ownership Motion in Limine on the basis that they were prejudiced by not having had this matter brought as an adversary proceeding.

Jeffrey and Wendy cannot have it both ways. They cannot reject the Court's offer to convert this contested matter into an adversary proceeding, yet demand that the Sale Motion be denied because they were denied their rights to an adversary proceeding. Moreover, as stated previously, this case has not been treated in a summary fashion. Jeffrey and Wendy rely on *In re Montgomery*, 262 B.R. 772 (8th Cir. 2001) to support their position that the relief sought by the Sale Motion should have been sought by adversary proceeding. *Montgomery* stands for the proposition that once a "colorable" claim of ownership is presented in the context of a motion for relief from stay (which would otherwise be a summary proceeding), an adversary proceeding is appropriate. *Id*. at 776.

This case is inapposite. First, as the evidence reflects, there is barely any color to Jeffrey's and Wendy's claim. Second, they were accorded numerous of the protections of an adversary proceeding and the trial of their claim was not handled in summarily. Third, when the Court offered to stop the trial in order to give Jeffrey and Wendy an additional opportunity to take discovery, they flatly rejected that offer.

The Ownership Motion in Limine is properly denied. Jeffrey and Wendy have been provided

_____

[4] At the time of the status conference, it was the intention of the Trustee to call Ms. Infante as a rebuttal expert. Subsequently, the Trustee elected not to call an expert.

with opportunities to conduct the discovery that they say was denied to them because the Trustee filed this case as a contested matter instead of an adversary proceeding. Jeffrey and Wendy were served with the Sale Motion when it was filed in December, 2007. They filed an objection to the Sale Motion twenty days after it was filed. They received actual notice of it and of the hearing on it. They did nothing about it and filed nothing until April 1, 2008, the night before trial, notwithstanding that their objection was filed on January 8, 2008, almost three months before. Given all of the circumstances in this case, Jeffrey's and Wendy's rights have been sufficiently protected in the context of this contested matter.

<u>The Debtor's Objection to the Sale Motion</u>

Mr. William Siskind, the Debtor, filed his own objection [773] to the Sale Motion. The Debtor objects to the proposed transaction on the grounds of adequacy of consideration. In his objection, Mr. Siskind argues that the price obtained by Mr. Gray is inadequate because prior offers obtained by Mr. Siskind have been in the $12 million range. Thus, Mr. Siskind alleges, it is an abuse of Mr. Gray's discretion to accept such a low offer. However, none of the supposed offers obtained by Mr. Siskind have been brought to the Court for approval at any time. It appears that none of them have ever been real or developed enough to reach that stage.

In addition, Mr. Siskind argues that, given more time, he believes that he will be able to come forward with a higher and better offer from a third party for the casino. The Debtor points to the Order [763] that extends the time the Trustee has to liquidate the assets of the estate through and including June 30, 2008.[5] Mr. Siskind argued at the hearing that, if he were given this full allotment

---

[5] That deadline has been extended by agreement of the parties through September 30, 2008. *See* [903].

of time through June 2008, to which he believes he is entitled, he would be able to bring a qualified purchaser to the table.  As of this writing, Mr. Siskind has brought no such party to the Court's attention.

<u>The Sale Price is Adequate</u>

Mr. Gray testified as to the difficulties that the sale of the casino presents.  One of the difficulties about which Mr. Gray testified is that he cannot market the full ownership of the casino and  is only able to market the Debtor's interest in the casino.  Mr. Gray can only market what he has - an up to 50% interest of the stock in the casino, ownership of which will be shared by a partner who may not be enthusiastic about the sale.  Moreover, Mr. Vincent has a contractual right of first refusal, as does Marriott Corp.

In comparing the sale price brought to the table by the Trustee with the offers that Mr. Siskind purportedly can procure, it is important to note that the Trustee is selling, at most, only the estate's 50% interest in the casino.[6]  Mr. Siskind maintains that he procured or can procure offers for 100% of the interests of the casino - both the interests under his control and Mr. Vincent's interests. Mr. Gray testified about other difficulties in selling the casino.  He testified that the casino is a cash business and that there have been inadequate internal cash and accounting controls.  Thus, there is no real opportunity to present a potential purchaser with verifiable numbers on which to base due diligence.  Mr. Gray testified that the casino is "tired"and in need of an upgrade - - a fact that Mr. Siskind did not dispute.

La Mesa, too, has its own marketing difficulties.  Like the casino, it is a joint venture between

---

[6] Mr. Siskind has stated his belief that the entire casino is not worth more than $6 million as of March 10, 2008.  See Trustee Exhibit 21.

Mr. Vincent and Mr. Siskind.  It is a race track located in the State of New Mexico but it is currently non-operational because it does not hold a gaming license.

In addition to the cash price that the estate will receive on account of the proposed sale, the estate will receive added value in the form of the subordination of claims totaling over $1 million. Further, Mr. Vincent will indemnify the estate for claims of employees or for tax obligations arising out of the sale. In addition, professionals have agreed to take a 15% deferral of fees to permit unsecured creditors to be paid timely.  Accordingly, the value of the Trustee's proposed transaction to the estate is greater than the $2.7 million cash component of the sale.

The Court finds that Mr. Gray's testimony is credible and that there are indeed substantial obstacles to marketing a sale of only a portion of the stock of the casino to a third party.  As Mr. Siskind himself testified, he attempted to bring two potential buyers to the table but was thwarted by Mr. Vincent's lack of cooperation and his refusal to sell his stock.  There is nothing to suggest that the Trustee does not face these same obstacles when trying to sell the estate's interest in the casino to any party other than Mr. Vincent, just as he now faces opposition when trying to sell the estate's interest to a party other than a party desired by Mr. Siskind.   This case is an apt demonstration of the principle that value and liquidity of shares are limited in the stock of a closely-held corporation.

The sale price is fair and reasonable.  Not only would it appear difficult to get Mr. Vincent to agree to a sale to a third party, it would be difficult to sell the Debtor's shares of the casino with Mr. Vincent as an existing partner.  Moreover, if a sale were made to a third party, certain obligations of the casino would need to be paid prior to the sale.  Here, the sale is being offered to Vincent gross of existing obligations.

The Court has wide latitude in approving a sale of assets under § 363 (b).  *Stephens Industries*

11

*v. McClung*, 789 F.2d 386 (6ᵗʰ Cir. 1986).  In the context of a Chapter 7 case, the Fourth Circuit has

commented that "as long as the trustee acts reasonably and in the best interests of the estate and as

long as []he obtains fair value for the property under the circumstances of the case, [his] choice of

method of disposition will be respected."  *In re Merry-Go-Round Enterprises, Inc.*, 180 F.3d 149 (4ᵗʰ

Cir. 1999).  The factors the Court must find for approval of a sale are: (i) a sound business reason

justifying the sale, (ii) adequate and reasonable notice of the sale to all parties, (iii) that the sale has

been proposed in good faith and (iv) that the purchase price is fair and reasonable. *In re Delaware

& Hudson Railway Co.*, 124 B.R. 169, 176 (D.Del. 1991).  The Trustee has carried his burden and

demonstrated that the proposed sale should be approved under the foregoing factors.

<u>The Debtor Is Not Entitled to Additional Time to Procure An Alternate Sale</u>

The Debtor argues that he should have been permitted to June 30, 2008 to obtain a purchaser

for the estate assets subject to the Sale Motion.  This argument is based on the Court's Order [763]

that provides that "liquidation of the Debtor William L. Siskind's interest in property shall occur by

June 30, 2008."   Of course, through the passage of time, this date has arrived, and to the best of the

Court's knowledge, no legitimate offer has been brought to the table by Mr. Siskind.[7]   However,

even assuming *arguendo* that Mr. Siskind could produce a timely, viable offer, the plain language

of the Court's prior order indicates that it is a deadline, applicable to the Trustee, not Mr. Siskind.

It is not a right or a privilege that has been conferred upon the Debtor.  The prior order does not grant

the Debtor any entitlement to sufficient time to procure an offer of purchase.

Neither is the Debtor entitled to additional time under the circumstances of this case.  This

---

[7]  The Court notes here, as it did earlier, that the deadline by which the Trustee may sell the
estate's assets has now been extended through and including September 30, 2008.  *See* docket entry [903].

12

bankruptcy case has been pending for six years. The Trustee testified that this transactions is the culmination of three years of work to liquidate these assets and that transaction will pay off all creditors nearly 100%. The Trustee has the authority to sell assets and considered offers in the exercise of his business judgment. The Debtor has attempted to find third party purchasers for the estate assets but has been unable to do so over the course of years that this case has been pending. During the trial, the Debtor testified that he was close to a deal that could be finalized April 30, 2008. This did not happen. The Debtor has been given sufficient time to bring a higher and better offer and has not done so.

### The Settlement is Fair and Reasonable

Pursuant to the settlement aspect of the Sale Motion, certain claims belonging to entities controlled by Mr. Vincent will be subordinated or withdrawn. The "TransAmerican claim" will continue to be subject to objection by Mr. Siskind, if Mr. Siskind elects to pursue that objection.[8] Mr. Vincent will withdraw his own proof of claim in its entirety. Mr. Vincent, Transamerican and the Trustee shall execute a stipulation of dismissal with prejudice dismissing the adversary proceeding filed by the Trustee against Mr. Vincent and Transamerican in the Debtor's bankruptcy case.

Because this is not only a sale of assets but a settlement of certain pending adversary proceedings, the Court must also consider the Sale Motion under the standards for the approval of a settlement. In deciding whether to approve a settlement, the Court should consider: (i) the probability of success in any litigation matters subject to compromise, (ii) the difficulties of collection or judgment, (iii) the complexity of the disputes involved and the expense, inconvenience and delay attendant to them and (iv) the interests of creditors and reasonable deference to their views.

---

[8] The Transamerican claim is claim no. 8 in the amount of $428,651.00

*Protective Committee for Independent Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414 (1968); *See also United States ex rel. Rahman v. Oncology Associates*, *P.C.*, 269 B.R. 139 (D. Md. 2001) (applying foregoing factors).

The *Rahman* Court recognized that settlements are to be encouraged and that a court may approve a settlement over objections "unless the proposed settlement falls below the 'lowest point in the range of reasonableness.'" *Rahman* at 149 *citing In re New York, New Haven and Hartford Railroad Co.*, 632 F.2d 955, 959-60 (2d Cir. 1980).

This Court has explained the history and difficulties between these parties in some detail. The Court gives reasonable deference to the judgment of the Trustee and is satisfied that the settlement, as part of a 100% (or nearly so) distribution to creditors, is well within the Trustee's business judgment and within the range of reasonableness.

<u>The Allocation of Stock Interests in Casino Del Caribe</u>

Jeffrey's and Wendy's next objection to the Sale Motion is based on their assertion that they each own a 10% <u>undivided</u> <u>interest</u> in the casino and that the Sale Motion seeks to affect their ownership interests improperly. Jeffrey and Wendy, however, have not established a colorable claim of individual non-joint ownership of the stock.

During his testimony on April 9, 2008, Mr. Siskind, Jeffrey's and Wendy's father, testified that Casino Del Caribe was incorporated in the 1984/1985 time period. Mr. Siskind, who was the casino's counsel and president during that time period, testified that the 1,000 original shares in the casino were issued as follows: (i) 200 shares to William Siskind, (ii) 100 shares to Jeffrey Siskind, (iii) 100 shares to Wendy Siskind Buckingham, (iv) 100 shares to Mangin, Inc., (v) one share to Robert Bacon, (vi) one share to Robert Lures and (vii) 498 shares to Mr. Vincent. This share

14

allocation is consistent with the initial subscription agreement for the casino dated December 1984, a translation of which was admitted as Jeffrey and Wendy Exhibit 6.[9]

Mr. Siskind testified that the 100 shares issued to each of his children were gifts from him. Mr. Siskind has no writing evidencing the gifts and has no memory of delivering the stock certificates to his children.

In 1998, a recapitalization of the casino occurred. This is evidenced by Trustee Exhibit 18. As part of the 1998 recapitalization, Mr. Siskind testified that shares in the casino were issued as follows: (i) 50,000 shares to Transamerican, (ii) 25,000 shares to William Siskind and Judith Siskind (Mr. Siskind's wife), (iii) 11,250 shares jointly to Judith Siskind and Jeffrey Siskind (iv) 11,250 shares to William Siskind and Wendy Buckingham Siskind and (v) 2,500 shares to Mangin. This share allocation is confirmed by stock certificates that were introduced as Trustee Exhibits 3 a through 3 e.[10]

Wendy testified that she was not present at the 1998 special meeting of the casino during which the recapitalization was authorized nor did she have any knowledge of it. But the minutes signed by her father as "President," and by Ida Manly as "Secretary," suggest that she was present or that her proxy was presented. The minutes state that "[a]t this meeting all of the shareholders were present, either in person or by proxy..." *See* Trustee Exhibit 18. The minutes further state that "Mr. Siskind, on behalf of Transamerican Commercial, Ltd., Mangin, Inc., Judith Siskind, Jeffrey Siskind

---

[9] The Spanish language version of this exhibit was admitted as Jeffrey and Wendy Exhibit 2.

[10] Trustee Exhibit 18 refers to the certificates to be issued to Jeffrey jointly as being issued with his mother, Judith Siskind. The certificate to Jeffrey was actually issued jointly with his father, William Siskind. *See* Trustee Exhibit 3c. Issuance jointly to William Siskind and Jeffrey is consistent with every other document showing joint ownership of Jeffrey's interest. Thus, it appears that the reference to Judith Siskind owning the certificate jointly with Jeffrey may have been a scrivener's error.

and Wendy Buckingham requested the distribution of the remaining 50,000 shares of the authorized stock to be distributed as follows:

> 25,000 shares to William Siskind and Judith Siskind, his wife
>
> 11250 shares to Judith Siskind and Jeffrey Siskind, jointly
>
> 11250 shares to William Siskind and Wendy Buckingham, jointly
>
> 2500 shares to Mangin, Inc."

Trustee Exhibit 18.

Prior to the recapitalization in 1998, the shares of the casino were pledged to Riggs Bank. *See* Trustee Exhibit 34, the Mutual Stock Pledge Agreement. At the time of this stock pledge, it appears that the capitalization of the casino was 1,000 shares, held as follows: (i) Transamerican Commercial- 232 shares, (ii) Mangin - 100 shares, (iii) Transamerican Dominicana - 332 shares, (iv) Ralph DeChiaro - 333 shares, (v) the Transamerican entities and Ralph DeChiaro jointly - 1 share, (vi) Roger Bacon - 1 share, and (vii) Wendy Siskind Buckingham - 1 share. *See* Appendix A to Exhibit 34. The shares were released by Riggs from escrow on May 29, 1998 because the debt which they were pledged to secure was fully paid at that time. *See* Trustee Exhibit 33.

The 1998 recapitalization appears to be the last change in ownership of the stock certificates. This ownership allocation is confirmed by subsequent financing transactions. For example, documents given to Banco Progresso in connection with a loan on February 15, 1999 reflect this same 1998 distribution of ownership. On August 27, 2005, Jeffrey and Wendy each executed an identical limited power of attorney in favor of Mr. Siskind authorizing him to "enter into and consummate a sale of *those shares of capital stock held jointly by the undersigned* in Casino Del Caribe, S. A., a Dominican corporation..." *See* Trustee Exhibits 23 (b) and (c) (emphasis added). Mr. Siskind

16

testified that he believes that the ownership interests as consummated in the wake of the 1998 recapitalization are current and remain valid. *See* Mr. Siskind's testimony of April 9th.

In contrast, Wendy and Jeffrey rely on the initial capitalization and dispute the efficacy of the subsequent recapitalization, citing its lack of compliance with Dominican law. In addition, Jeffrey and Wendy rely on unexecuted minutes of an extraordinary meeting of shareholders of the casino dated October 12, 1997. *See* Jeffrey and Wendy Exhibit 6.[11] These minutes reflect the shareholders' intent to increase the authorized stock amount and to distribute shares individually to Jeffrey and Wendy, among others. Not only is this document unexecuted, but Mr. Siskind, the entity's president, testified that the transactions contemplated in that document were never completed because the shares were being held by Riggs Bank pursuant to the pre-existing pledge at that time.

Throughout the course of this bankruptcy case, Jeffrey and Wendy have had myriad opportunities to assert their individual ownership interests, yet they chose not to do so. Every paper filed by their father in his bankruptcy case has been <u>inconsistent</u> with his children's present claim that they each own 10,000 shares of the casino in their individual capacities. For example, page 17 and 18 of the Debtor's Disclosure Statement does not reflect that shares in the casino are held individually by Jeffrey and Wendy. *See* Trustee Exhibit 20. Neither do the Debtor's schedules. *See* Debtor Exhibits 9 and 10.[12]

At all relevant times, Mr. Siskind, Jeffrey and Wendy have acted inconsistently with a

---

[11] The Spanish language version of this document was admitted as Jeffrey and Wendy Exhibit 3.

[12] Jeffrey and Wendy make much of the fact that the number of shares held jointly by Jeffrey and the Debtor and Wendy and the Debtor is higher in the Debtor's schedules than in other documents. During his testimony, the Debtor explained that this discrepancy occurred because the Debtor subsumed the Mangin shares in his calculation.

purported direct individual ownership by Jeffrey and Wendy of 10% each of the casino. Mr. Siskind originally testified that from 1984 through early 2000's, the original shares were always in his possession, or in the possession of the lender to which they had been pledged. He also testified that all shareholder distributions made on account of the stock went to Mr. Siskind and not to Wendy and Jeffrey. He admitted that he "skipped some formalities" and that he "had certain interests" because they were his children. In his March 25, 2008 deposition testimony, Mr. Siskind admitted that he treated and considered the stock as his own. For example, Mr. Siskind testified that he signed his daughter's signature on the pledge to Riggs Bank.

Wendy testified that in 1988 her father invited her to the Santo Domingo casino during her honeymoon and verbally gifted to her 10% of the casino's shares (and told her that her brother owned the same percentage of shares). She has never attended a shareholder meeting in the Dominican Republic. She has never been notified of a shareholder meeting. She testified that she has never been told of any change of her ownership interest. She has never had physical possession of the stock certificates of Casino del Caribe. She did give her father powers of attorney but she says that she did not specifically authorize him to change the ownership. She testified that her father did not inform her about changes in the stock ownership.

In a deposition held on October 19, 2005 that was taken in connection with the Debtor's Chapter 11 Plan confirmation, Wendy was given a copy of the Plan and the Third Amended Disclosure Statement and was asked whether the ownership interests reflected in that Disclosure Statement were correct. (Trustee Exhibit 28). The document reflects on its face that Jeffrey and Wendy did <u>not</u> own shares individually but owned them jointly with their father. Not only did Wendy admit that the joint distribution of ownership interests was correct, but she also stated that she

18

wasn't sure, prior to looking at the Disclosure Statement, how may shares she owned.  In short, in light of the conflicting documentary evidence, and Wendy's inconsistent actions, Wendy's testimony that she and her brother owned the shares individually is just not credible.

Accordingly, based on the evidence and the record in this case, including, (i) the evidence regarding the stock allocation as stated in the 1998 recapitalization of Casino Del Caribe (including Mr. Siskind's testimony), (ii) the stock certificates, (iii) other documents consistent with the stock allocation as stated in the 1998 recapitalization and (iv) Wendy's deposition testimony that the allocation as set forth in the 1998 capitalization is correct, this Court finds that the relevant interests of the casino are held as follows:

> 50% by an entity controlled by Stephen Vincent
>
> 25% by William Siskind and Judith Siskind
>
> 11.25% jointly by William Siskind and Jeffrey Siskind
>
> 11.25% jointly by William Siskind and Wendy Siskind Buckingham
>
> 2.5% by Mangin, an entity controlled by the Debtor.

Although the Trustee argued that the shares owned jointly by William Siskind with Jeffrey and Wendy were foreclosed upon under Dominican Law and may have been severed, there has been insufficient evidence presented to this Court to allow such a finding.

<u>The Court Will Permit the Sale of the Debtor's Interests</u>

The statutory predicate for the sale of the assets subject to the Sale Motion is § 363 of the Bankruptcy Code.  The Trustee is authorized to sell the shares the Debtor owns in Mangin and La Mesa pursuant to § 363 (b) (1) which permits a trustee, after notice and a hearing, to sell, other than in the ordinary course of business, property of the estate.

The Trustee is also authorized to sell all of the Debtor's right, title and interest in the apartment at the Juaragua Hotel pursuant to this same section.  The Debtor argues that his right to use this apartment is not assignable.  The assignability or non-assignability of this interest is not being determined herein; the Trustee is simply selling whatever interest the Debtor has and the purchaser is willing to accept the risk inherent in those terms.

With respect to the 25,000 shares in the casino that are jointly owned by the Debtor and his wife, the Trustee is authorized to sell these tenants-by-the-entireties shares in the casino pursuant to § 363 (h).   This section gives express authority to sell an asset in which a debtor holds an interest as a tenant by the entireties.

Section 363 (h) provides:

Notwithstanding subsection (f) of this section, the trustee may sell both the estate's interest, under subsection (b) or (c) of this section, and the interest of any co-owner in property in which the debtor had, at the time of the commencement of the case, an undivided interest as a tenant in common, joint tenant, or tenant by the entirety, only if--

(1) partition in kind of such property among the estate and such co-owners is impracticable;

(2) sale of the estate's undivided interest in such property would realize significantly less for the estate than sale of such property free of the interests of such co-owners;

(3) the benefit to the estate of a sale of such property free of the interests of co-owners outweighs the detriment, if any, to such co-owners; and

(4) such property is not used in the production, transmission, or distribution, for sale, of electric energy or of natural or synthetic gas

for heat, light, or power.

Even though the shares to be sold are held as tenants-by-the-entireties, the Sale Motion does not contemplate that the Trustee will turn over any surplus proceeds to Mrs. Siskind. In accordance with § 363 (j), the Trustee need not do so in the circumstances presented herein.[13] It is not required in this instance because the Trustee proposes to use the proceeds of these interests to pay joint creditors and Mrs. Siskind has not objected to this disposition. *See Sumy v. Schlossberg*, 777 F.2d 921, fn. 25 (4th Cir. 1985) (a trustee may administer joint assets for the benefit of joint creditors). The Trustee may sell the tenants-by-the-entireties shares.

As to the mechanics of the sale of the jointly-owned shares owned by the Debtor and Wendy and the Debtor and Jeffrey, the Court will permit a  The Court will permit *de facto* partition of these shares pursuant to § 363 (h).  *See In re Belyea*, 253 B.R. 312, 314 (Bankr. D.N.H. 1999) ("[b]y implication...the Court has the authority to permit partition of property jointly owned by the Debtor and third parties."); *In re Batten*, 141 B.R. 899, 906 (Bankr. W.D. La. 1992) ("If the court has the authority to sell the co-owner's interest in property where a partition in kind is not 'practicable,' *a fortiori ratione*, it can compel a partition in kind where such is practicable.")

Here, the property interest at issue is a number of shares certain in a corporate entity.  As such, it is practicable to partition the Debtor's and Jeffrey Siskind's shares in the casino, and it is also

---

[13] Section 363 (j) provides:

After a sale of property to which subsection (g) or (h) of this section applies, the trustee shall distribute to the debtor's spouse or the co-owners of such property, as the case may be, and to the estate, the proceeds of such sale, less the costs and expenses, not including any compensation of the trustee, of such sale, according to the interests of such spouse or co-owners, and of the estate.

21

practicable to partition the Debtor's and Wendy Siskind Buckingham's shares in the casino. The Trustee is therefore authorized to partition the shares and sell the Debtor's one-half interest in the share certificates pursuant to § 363 (h) in accordance with the Court's findings set forth herein as to the number of shares owned by the respective shareholders.[14]

Mr. Vincent is Entitled to § 363 (m) Protections

Contrary to the Debtor's assertion, the original letter of intent submitted to the Court put the parties on notice that the Trustee and Mr. Vincent intended to seek § 363 (m) protection for their proposed transaction. Notwithstanding, the Debtor challenged Mr. Vincent's status as a good faith purchaser for the first time during closing argument, asserting that Mr. Vincent was a "known stay violator" and that he gave elusive testimony during his deposition.

Section 363 (m) of the Bankruptcy Code provides:

> **(m)** The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

---

[14] At closing argument, counsel for the Trustee urged that the Court could go through any one of three legal and procedural "doors" to order sale of the stock certificates owned by the Debtor and Jeffrey and the Debtor and Wendy: (i) the Court could find that the shares were already severed as a result of litigation in the Dominican Republic, (ii) the Court could find that it would be impracticable to sever the shares because of litigation in the Dominican Republic, or (iii) the Court could order a de facto partition of the shares. Counsel urged the Court, "You end up with the exact same result, the right to in fact sell 5,625 shares [of each 11,250 certificate.]" See Transcript of Hearing Held April 30, 2008 at 42 - 43. The Court points this out, in part, to demonstrate that partition is one of the vehicles acceptable to the Trustee and Mr. Vincent under the Agreement and that Mr. Vincent does not take the position that he will not purchase under the Agreement if any stock ownership in the casino is still vested in Siskind family members.

By giving § 363 (m) protection to the proposed sale, the Court does not give its stamp of approval to every action that the buyer has taken throughout the course of a bankruptcy case. Instead, the good faith of a purchaser is shown by the integrity of his conduct during the course of the sale proceedings. *Willemain v. Kivitz*, 764 F.2d 1019, 1023 (4th Cir. 1985) ("[t]ypically, the misconduct that would destroy a purchaser's good faith status at a judicial sale involves fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders."). Thus, it is not germane for the purposes of this determination that Mr. Vincent allegedly violated the automatic stay in an unrelated proceeding earlier in this bankruptcy case or that deposition testimony he previously gave to the Trustee was not forthcoming. *See In re Gucci*, 126 F.2d 380 (2d Cir. 1997) (alleged automatic stay violations and "aggressive litigation strategy" by purchaser did not preclude good faith finding of purchaser because conduct was not aimed at controlling sale).

There is no evidence of any fraud, collusion or attempts to take grossly unfair advantage of any buyers by Mr. Vincent. The Trustee testified as to the attempts the Trustee made to market the assets, his negotiations with Mr. Vincent and his attempts to procure other third party bidders. No other qualified bidders have presented themselves to the Trustee. The sale price is fair and reasonable. The Court has already found that the sale price is adequate. *See supra*. As a court of equity, the Court is also mindful of the Trustee's testimony that the proposed sale is likely to allow for 100% payment of the allowed outstanding claims of creditors in this case. This sale is also in the best interest of creditors. American Acquisition, LLC, the only non-family member creditor to appear at the hearing on the Sale Motion urged the Court to approve this sale transaction.

Notions of International Comity and Extraterritoriality Do Not Compel a Contrary Result

Pursuant to § 541 of the Bankruptcy Code, all property of the Debtor, wherever located, is property of the estate. Similarly, a court presiding over a bankruptcy case has jurisdiction over "all property wherever located, of the debtor as of the commencement of the case, and of property of the estate." 28 U.S.C. § 1334 (e) (1).

Jeffrey and Wendy argue that principles of international comity and the presumption against extra-territoriality demand that Dominican law is determinative of their interest in the casino. This argument was raised for the first time during closing argument. Jeffrey and Wendy's failure to give notice of their intent to rely on foreign law is a sufficient basis upon which to reject any argument based on Dominican Law. *See Microbix Biosystems , Inc. v. BioWhittaker, Inc.*, 184 F. Supp. 2d 434 (D. Md. 2000) (refusing to apply Ontario law where litigant failed to give notice of intent to rely on foreign law under Fed. R. Civ. P. 44.1). Further, Jeffrey and Wendy did not establish what Dominican law *is* relative to the stock ownership. Though they cited one Dominican statute, they did so in a vacuum and without an opportunity for any party to respond. Jeffrey and Wendy did not establish that the single statute they cited is controlling.

The presumption against territoriality states that, in the usual case, it is presumed that United States laws are to be applied only within the territorial United States, unless a different intent is evidenced by Congress. *See, e.g., EEOC v. Arabian American Oil Co.*, 499 U.S. 244 (1991) (American employee of Delaware corporation operating in Saudi Arabia was not entitled to Title VII employment protections because these protections do not apply extraterritorially to United States citizens working abroad for United States employers).

The parameters of the presumption against extraterritoriality, and the applicability of the

24

presumption in the bankruptcy context, were discussed recently by the Fourth Circuit in *In re French*, 440 F.3d 145 (4th Cir. 2006). The facts are important to the analysis and applicability in this case. In *French*, the debtor, a Maryland resident, gifted a deed of Bahamian property to her adult children, one a resident of Virginia and the other a resident of Maryland. *Id*. at 148. The debtor did not immediately record the deed in the Bahamas. *Id*. Years later, the debtor began having financial difficulties and her children, alarmed by this turn of events, recorded the deed in the Bahamas. *Id*. Within a year after the recordation, the debtor's creditors filed an involuntary bankruptcy petition against her and an order for relief was entered under Chapter 7. *Id*. The Chapter 7 trustee filed a fraudulent conveyance action to recover the transferred property pursuant to § 548 of the Bankruptcy Code. *Id.* The debtor argued that because the subject real estate was located in the Bahamas and because of the presumption against extraterritoriality the transaction was controlled by Bahamian law. *Id*. Under Bahamian law, the debtor maintained, the transfer was not avoidable. *Id.*

The Court of Appeals court first determined in the *French* case that the presumption against extraterritoriality may not be warranted at all because the conduct may have taken place in the United States, notwithstanding that the property was located in the Bahamas and the recordation occurred there. The Court of Appeals determined that it is appropriate for courts to adopt a "flexible approach" to where the conduct occurred, and to review "all component events of the transfer." *Id*. at 150. Utilizing this test, the court found that the perpetrator and all of the victims (other than a single creditor) had long been located in the United States. Given these circumstances, the court found that "the effects of this transfer were (naturally) felt most strongly here, and not in the Bahamas." *Id.* at 150. The court regarded recordation of the deed in the Bahamas as "incidental." *Id*. Recognizing the powerful interest that countries have in regulating real estate within their

borders, the Fourth Circuit nonetheless determined that the presumption against extraterritoriality did not apply because of the express and extensive impact of bankruptcy law. *Id*.

The court recognized the *in rem* jurisdiction of the bankruptcy court over all debtor property, foreign or domestic, under § 541 of the Bankruptcy Code. *French* at 151. Relying on the far-reaching language of § 541 and its conceptual incorporation into §548, the court in the *French* case ultimately found that §548 could be applied extraterritorially. *Id*. Similarly, § 541 is available to the Trustee and to this Court to permit this Court to exercise *in rem* jurisdiction over the property of the Debtor, including, in this case, Dominican property. Congress mandated that a United States district court (and bankruptcy court by reference) shall have exclusive jurisdiction of all property, wherever located, of a debtor as of the commencement of a bankruptcy case. *See* 28 U.S.C. § 1334 (e) (1).

The argument that international comity compels the application of foreign law was also raised by the debtor in *French* and rejected by the Fourth Circuit in that case. International comity is "the recognition which one nation allows within its territory to the legislative, executive or judicial acts of another nation, having due regard both to international duty and convenience, to the rights of its own citizens or of other persons who are under the protection of its laws." *French* at 152 *quoting Hilton v. Guyot*, 159 U.S. 113, 164 (1895). In determining whether to apply foreign law to a given transaction a court must consider: (i) the extent to which the activity takes place within the territory of the regulating state, (ii) the connections, such as nationality, residence or economic activity between the regulating state and the person primarily responsible for the activity to be regulated, (iii) the extent to which other states regulate such activities or may have an interest in regulating them, (iv) the likelihood of conflict of regulation with another state, and (v) the importance of regulation to the regulating state. *French* at 153 *citing Hartford Fire Ins. Co. v. California*, 509 U.S. 764

26

(1993) and *Restatement (Third) of Foreign Relations Law* § 403 (2).

Applying the foregoing factors, the *French* court determined that the doctrine of international comity did not require it to forego United States law in favor of Bahamian law. *French* at 153. Even though Bahamian real property was involved, the court found that the real property was part of an aggregate of property (the debtor's estate) that was most effectively dealt with as a unit. *Id*. at 153 - 154. The court determined that the United States had a stronger interest in regulating the transaction than the Bahamas - -  the transferor and transferee (as well as the majority of the creditors) were United States citizens and the Bahamas had little to no interest in protecting non-residents.    *Id*. at 154.

The instant case presents enough factual and legal similarities to *French* that this Court finds it controlling.  Indeed, it was cited to this Court by the Trustee as well as Jeffrey and Wendy.  In the instant case as in *French*, the United States has the stronger interest in adjudicating this dispute than the foreign nation - - here the Dominican Republic.  The Debtor's interest in the casino is property of the estate under § 541, regardless of where it is located, and the Debtor's interest is subject to sale under the provisions of § 363.  Even though the casino itself is a Dominican corporation, the Debtor's interest in the corporation is cannot be said to be physically located within the borders of a particular country.   All of the direct and indirect individual owners of the casino are United States residents and the books and records of the casino are located in the United States.  Jeffrey and Wendy are both United States residents.  The Debtor is a United States citizen who voluntarily sought bankruptcy protection in the United States.  The Bankruptcy Court has jurisdiction to administer assets pursuant to the Debtor's confirmed plan of reorganization.  Section § 1142 (b) of the Bankruptcy Code and the provisions of the confirmed plan place post-confirmation jurisdiction within this Court.  *See*

Article 11 of Debtor's Third Amended Plan of Reorganization [437]. Accordingly, notions of international comity do not compel the application of Dominican law to this dispute.

<u>Conclusion</u>

The Sale Motion will be granted.  A separate order will issue.


cc:    Alan M. Grochal, Esquire
       Richard M. Kremen, Esquire
       Joyce Kuhns, Esquire
       Jeremy Friedberg, Esquire
       Matthew G. Summers, Esquire
       Office of the United States Trustee


**END OF MEMORANDUM**